## Case No. 3,323.

### In re CRAIG.

[4 N. B. R. (Quarto) 50.] [1]

District Court, S. D. New York. 1870.

#### EXAMINATION OF BANKRUPT.

1. Where the bankrupt on his examination declines answering questions relative to his wife's property, *held*, that the same were pertinent and proper.

2. Where the wife of a bankrupt on examination before a register declines to answer because the matters enquired of are her private business, *held*, that the same were pertinent and proper.

[On certificate of register in bankruptcy.

[In the matter of Daniel H. Craig, a bankrupt.

[For a prior decision as to the pertinency of certain questions, see Case No. 3,322.]

I, Odle Close, one of the registers of said court in bankruptcy, do hereby certify that in the course of the proceedings in said cause before me, the following questions arose pertinent to said proceedings, to wit:

Mr. D. H. Olmstead appeared as counsel for Mahlon Vail, a creditor of said bankrupt, and Mr. E. Ensign as counsel for the bankrupt on the examination of said bankrupt at instance of said creditor.

The following is a summary of the evidence upon the points to be submitted to the court: The said bankrupt on his examination testified as follows: "Q. 1042.—Has your wife derived any property since her marriage, and prior to 1856, either from you, or from any other person to your knowledge? Mr. Ensign—I object so far as the question relates to any other person. As far as it relates to himself, the question has been already asked. Q. 1043—If so, state what amounts, from whom and what property? (Same objection.) * * * Q. 1031—Do you know whether your wife has derived any property, real or personal, from any person, since your marriage? (Objection.) Q. 1034—Has she derived any property from you, or any interest in any property since your marriage with her, except such as was necessary for her support? Mr. Ensign—I object to the question on the ground that it is a question of law to decide what amount of property is necessary for her support, and impossible to answer the question as a matter of fact. Q. 1039—What other property than was necessary for the immediate support of your wife and family have you given to her, and when have you given it to her, and in what amounts? (Same objection.) Q. 1040—Has your wife ever held in her own right, any stock, or any interest in any telegraph company, or in any patent connected with a telegraph company, or any other property or estate of any character, which legally or equitably belonged to you? Mr. Ensign—I object to that on the ground that it is hearsay evidence; that is a matter of law, and not within the knowl-

[1] [Reprinted by permission.]

edge of the witness. (Mr. Olmstead gives notice to the bankrupt that unless the questions are answered, he shall, at the same time that they are certified to the court, make an application to the court that he may be punished for contempt of court in not answering the questions.) * * * Q. 1751—Are the statements contained in this printed circular now shown you in respect to the property correct? (Objected to on the ground that the circular is not in evidence. Mr. Olmstead offers circular in evidence. Mr. Ensign objects to the acceptance of the paper on the ground that it is irrelevant, incompetent, and improper—the object of the examination being the discovery of the bankrupt's property —a printed paper purporting to be a description of the property owned by his wife not proved to have been prepared by him is totally inadmissible.) Q. 1752—Is the property described in this circular the same property now occupied by yourself and wife at Peekskill? (Objected to on the ground that the paper is not in evidence, and the witness has no means of knowing what the property is there described, and that the question is irrelevant and incompetent, and further that there is no proof of any description that any part of the property is owned by Mr. Craig. (Paper marked, for identification, 'F.') * * * Q. 2219—Now please look at a paper purporting to be a contract annexed to the judgment roll, the contract being dated November 3, 1855, and state whether that is your signature to that contract. A.—Yes, sir. Q. 2220—And is that Hiram Hyde's signature to the contract? A.—It looks like it. Q. 2221—Did you execute that paper? A.—That is my signature. Q. 2222—Did you execute it? A.—I. signed it; that is all I know about it. Q. 2223—Did you or did you not execute it? Is that a contract made between yourself and Mr. Hyde? A.—I don't know what the contract is; that is my signature. Q. 2224—That is not an answer. A. —I can only say that there is no doubt about the signature. Yes, sir. I recollect that. Q. 2225—That was the contract made betwen you and Mr. Hyde, wasn't it? A.—I recollect the circumstance now. (Counsel for the creditor desires the bankrupt to state whether he did or did not execute the paper referred to.) * * * Q. 3218—Now, what was the particular reason why an assignment of an interest in that company was made to Mrs. Craig rather than to yourself? (Objected to as incompetent and improper.) A.— I can only answer that so far as my own sense of propriety was concerned. Mrs. McKinney signified her willingness and desire to convey to me one-third interest in that line on the ground, as she said, that she knew her husband felt as though I was entitled to it. My answer to Mrs. McKinney was that I had not done anything that Mr. McKinney had originally proposed that I should do to entitle myself to an interest, and that besides this, there were then rea-

sons connected with my relations with the Associated Press, and through that association with the public, which in my judgment rendered it improper for me to hold such interest, and therefore I declined to accept it. Q. 3219—Was not that interest put in Mrs. Craig's name for the express purpose of enabling you to appear to the world only as the agent of the Associated Press, while at the same time you might really have a large interest and control in the Commercial Telegraph Company, over whose lines a large portion of your private despatches and the despatches of the Associated Press were sent? (Mr. Ensign objects to the form of the question as incompetent and improper. To the question whether the property was put in Mrs. Craig's name for the purpose of allowing Mr. Craig to appear only as agent of the Associated Press, I have no objection. The remainder is mere surplusage and argumentative and I ask it to be stricken out. Bankrupt declines to answer under advice of counsel.) Q. 3260—Have you, during the course of this examination, examined a book purporting to be a copy of contracts heretofore in the custody of the American Telegraph Company, and purporting to contain copies of contracts in respect to which you have heretofore testified in this matter? (Objected to: 1st, as irrelevant, incompetent and improper; 2d, that the book referred to is not in evidence; 3d, that not being in evidence it is not within the knowledge of the witness that it contains copies of any particular contracts; 4th, that there is no proof that the contracts in regard to which he has testified are copied in that book. Witness declines to answer.) Q. 3261—Have you examined that book at the office of the Western Union Telegraph Company, since you first saw it produced on this examination, and did you or did you not make a thorough and critical examination of its contents, and was or was not the examination of the book the means of refreshing your memory about the matters therein mentioned in respect to which you have since then testified? (Objected to on the same grounds.) Q. 3262— Did or did not such examination of that book by you induce you to make answer different from what you had made before in respect to the interest and rights of yourself and the various parties in the Commercial and American Telegraph Companies? (Objected to on the same ground, and also on the ground that this question and the previous ones evidently have no other object than to harass, embarrass, and mislead the witness. Witness declines to answer.) Q. 3278—Had you at the commencement of your examination in this matter forgotten Mr. Hyde's connection with the stock? (Objected to on the ground that the question has been fully answered. Witness refers to his former answer on cross-examination on November 6th, in answer to this question. Mr. Olmstead asks counsel to point out question and answer. Objection

withdrawn.) A.—I had forgotten his true condition. Q. 3279—Had you forgotten that he had any connection with this stock? A.—My impression was that he had obtained possession of a certain amount of the 210 shares of stock, but I had quite forgotten the particular circumstances under which he had obtained it. Q. 3280—Question repeated. (Objected to on the ground that the question has been fully answered previous to today; that the witness had testified also previous to today; that Mr. Hyde had some connection with the stock, and that the last answer is a full and responsive answer to the question. Witness declines to answer further by advice of his counsel.) Q. 3281—Would it be possible for you now to remember what your feelings were at the time the advances were made as stated in your answer to question 3176, and at the same time to forget the main features of the transaction? (Question and answer here read to witness, being as follows: 'Q. 3176—In saying that you agreed to pay the assessments on the American Telegraph stock, and did pay those assessments to a certain extent, do you refer to your understanding that the moneys paid by you on the Vail line should be passed to the credit of that stock? A. Yes. I felt at the time that I was advancing money on account of the Vail line; that I was substantially paying the assessments on the 210 shares of stock for which I was responsible through Mr. Hyde, although the money may not have been, and I think was not actually entered on the books of the company to the credit of that stock.' · Question 3281 objected to as incompetent, improper, irrelevant and impertinent, and as ambiguous, and as harassing the witness. Witness declines to answer.) * * * Q. 3290—How much was paid to Mr. Croome and Mr. Brown, and when? (Objected to so far as it regards how much was paid, the witness having testified on his cross-examination that about $2,000 was paid to each. Witness declines to answer as to that part.)"

I further certify that in the same proceedings Helena Craig, the wife of said bankrupt, was examined as a witness before me at the instance of said creditor, and that the following is a summary of the evidence upon the points to be submitted to the court: The said Helena Craig on her examination testified as follows: "Q. 3575—Do you mean to say that you paid $6,000 for the entire property (State St. property)? A.—There was a mortgage on the property when I bought the lots. I paid between $12,000 and $13,000 for the property; that includes the mortgage upon the property which I afterwards paid. Q. 3576—Was there any mortgage on the property at' the time you procured the subsequent mortgage on the property? (Question objected to. Question to be certified.) Q. 3577—After your purchase of the property, did you give a mortgage upon it? A.—I did. Q. 3578—To whom? (Objected to.) A.—To Mr. Corning

for $7,000. Q. 3579—Did you use that money to pay off the first mortgage? A.—No, sir. Q. 3580—What did you use that money for? (Objected to. To be certified.) Q. 3603—Now please state the reason if you know, why the conveyance of this property was first made to your husband and not to yourself? (Question objected to.)"

[NOTE. For the examination of Helena Craig, wife of the bankrupt, see Case No. 3,324, next following.]